

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-4-1996

# IN RE: Unisys Svgs. Plan Litigation v. Unisys Corp.

Precedential or Non-Precedential:

Docket 95-1156

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation
"IN RE: Unisys Svgs. Plan Litigation v. Unisys Corp." (1996). *1996 Decisions*. Paper 240.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/240

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 95-1156, 95-1157 and 95-1186
_____

IN RE:  UNISYS SAVINGS PLAN LITIGATION

JOHN P. MEINHARDT, on behalf of himself and
all others similarly situated

        v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-03067)

MICHAEL HECK; JOSEPH MCCARTHY;
ANGELO DEPIETRO, on behalf of themselves
and all others similarly situated

        v.

UNISYS CORPORATION; THE ADMINISTRATIVE COMMITTEE
OF THE UNISYS SAVINGS PLAN; THE INVESTMENT COMMITTEE
OF THE UNISYS SAVINGS PLAN; JACK A. BLAINE;
JOHN J. LOUGHLIN; KENNETH MILLER; DAVID A. WHITE;
STEFAN RIESENFELD
(D.C. Civil No. 91-cv-03276)

GARY VALA, individually and on behalf
of all others similarly situated

        v.

JACK A. BLAINE; MICHAEL R. LOSEY; KENNETH L. MILLER;
STEFAN C. RIESENFELD; CURTIS A. HESSLER; DAVID A.
WHITE; UNISYS CORPORATION; THE NORTHERN TRUST COMPANY
(D.C. Civil No. 91-03278)

CAROLYN A. GOHLIKE, on behalf of herself and
all others similarly situated

        v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-03321)

DENNIS C. STANGA; JAMES M. COLLINS, on

1

behalf of themselves and all others
similarly situated

v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-04689)

JOHN H. BURGESS, JR., on behalf
of himself and all others similarly situated

v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-04696)

John M. Meinhardt, Michael Heck, Joseph McCarthy,
Angelo DiPietro, Gary Vala, Carolyn Gohlike,
Dennis C. Stanga, James M. Collins and John H.
Burgess, Jr.,

Appellants in No. 95-1156


IN RE:  UNISYS SAVINGS PLAN LITIGATION

JOHN P. MEINHARDT, on behalf of himself and
all others similarly situated

v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-03067)

BERNARD MCDEVITT, on behalf of himself
and all others similarly situated

v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-03126)

PARKER C. KEAN, on behalf of himself
and all others similarly situated

v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-03164)

2

NADIA F. SOS; FAROUK M. SOS, individually
and on behalf of all others similarly situated

        v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-03582)

KENNETH GOERS; JOHN J. CIESLICKI, on
behalf of themselves and all others similarly situated

    v.

UNISYS CORPORATION; THE NORTHERN TRUST COMPANY
(D.C. Civil No. 91-cv-04678)

WILLIAM TORKILDSON

    v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-04754)

  Bernard McDevitt, Parker Kean, Nadia F. Sos,
  Farouk M. Sos, Kenneth Goers, John J. Cieslicki
  and William Torkildson,

           Appellants in No. 95-1157


IN RE:  UNISYS SAVINGS PLAN LITIGATION

JOHN P. MEINHARDT, on behalf
of himself and all others similarly situated

    v.

UNISYS CORPORATION
(D.C. Civil No. 91-cv-03067)


HENRY ZYLLA; RICHARD SILVER; RONALD GRIPPO; EDWARD
LAWLER; RICHARD ANDUJAR; CLARENCE MULLER; CHARLES
WAHLER; JAMES MCLAUGHLIN; DONALD RADER; JOSEPH LAU;
JAMES GANGALE; ALFRED CONTARINO; RICHARD COLBY; JOHN
MARCUCCI; JOSEPH FIORE; RICHARD MASTRODOMENICO; NICK
KLEMENZ; PETER SZCZYBEK, on  behalf of themselves and
all others similarly situated;    ENGINEERS UNION
LOCAL    444 OF THE INTERNATIONAL UNION OF  ELECTRONIC,
ELECTRICAL, SALARIED, MACHINE AND FURNITURE
WORKERS, A.F.L.-C.I.O.; LOCALS 445 OF THE INTERNATIONAL
UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE AND
FURNITURE WORKERS, A.F.L.-C.I.O.; LOCALS 450 OF THE
INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL,
SALARIED, MACHINE AND FURNITURE WORKERS, A.F.L.-C.I.O.;

4

LOCALS 470 OF THE INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE AND FURNITURE WORKERS, A.F.L.-C.I.O.; LOCALS 165 OF THE INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE AND FURNITURE WORKERS, A.F.L.-C.I.O.; LOCAL 3, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, A.F.L.-C.I.O.

v.

UNISYS CORPORATION; EDWIN P. GILBERT; JOHN J. LOUGHLIN; THOMAS PENHALE, individually and in their capacities as members of the Unisys Employee Benefits Executive Committee and administrators of the Unisys Retirement Investment Plan; RICHARD H. BIERLY; CURTIS A. HESSLER; LEON J. LEVEL; KENNETH L. MILLER; DAVID A. WHITE; JACK A. BLAINE; STEFAN C. RIESENFELD; GEORGE T. ROBSON, individually and in their capacities as members of the Investment Committee of the Unisys Retirement Investment Plan
(D.C. Civil No. 91-cv-03772)

Henry Zylla, Richard Silver, Ronald Grippo, Edward Lawler, Richard Andujar, Clarence Muller, Charles Wahler, James McLaughlin, Donald Rader, Joseph Lau, James Gangale, Alfred Contarino, Richard Colby, John Marcucci, Joseph Fiore, Richard Mastrodomenico, Nick Klemenz and Peter Szczybek, individually and on behalf of the class certified,

Appellants in No. 95-1186

─────────────

Appeal from the United States District Court
for the Eastern District of Pennsylvania

─────────────

Argued
September 13, 1995
Before: Mansmann, Scirica and Nygaard, <u>Circuit</u> <u>Judges</u>.

(Filed January 4, 1996)

─────────────

James R. Malone, Jr., Esquire (Argued)
Michael D. Gottsch, Esquire
Chimicles, Jacobsen & Tikellis
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA  19041

5

Joel C. Meredith, Esquire
Daniel B. Allanoff, Esquire
Meredith, Cohen & Greenfogel
117 South 17th Street
22nd Floor
Philadelphia PA  19103

James I. Wasserman, Esquire
Julian R. Birnbaum, Esquire
Vladeck, Waldman, Elias & Engelhard
1501 Broadway
Suite 800
New York, NY  10036

> Counsel for Appellants:  John M. Meinhardt, Michael Heck, Joseph McCarthy, Angelo R. DiPietro, Gary Vala, Carolyn Gohlike, Dennis C. Stanga, James M. Collins, John H. Burgess, Jr., Bernard McDevitt, Parker Kean, Nadia F. Sos, Farouk M. Sos, Kenneth Goers, John J. Cieslicki, William Torkildson, Henry Zylla, Richard Silver, Ronald Grippo, Edward Lawler, Richard Andujar, Clarence Muller, Charles Wahler, James R. McLaughlin, Donald Rader, Joseph Lau, James Gangale, Alfred Contarino, Richard Colby, John Marcucci, Joseph A. Fiore, Richard Mastrodomenico, Nick Klemenz, Peter Szczybek

Laurence Z. Shiekman, Esquire (Argued)
Pepper, Hamilton & Scheetz
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA  19103-2799

Joseph A. Teklits, Esquire
Unisys Corporation
P.O. Box 500
M.S. C2NW 14
Blue Bell, PA  19424

> Counsel for Appellees:  Unisys Corporation, Administrative Committee of the Unisys Savings Plan, Investment Committee of the Unisys Savings Plan, Jack A. Blaine, John J. Loughlin, Kenneth L. Miller, David A. White, Stefan C. Riesenfeld, Michael R. Losey, Curtis A. Hessler, Edwin P. Gilbert, Thomas Penhale, individually and in their capacities as Benefits Executive Committe and administrators of the Unisys Retirement Investment Plan; Richard H. Bierly, Curtis A. Hessler, Leon J. Level, George T. Robson,

6

Marcia E. Bove, Esquire
Room N-4611
United States Department of Labor
200 Constitution Avenue, N.W.
Washington, DC  20210

       Counsel for Amicus-appellant Secretary of Labor

Mary Ellen Signorille, Esquire
American Association of Retired Persons
601 E Street, N.W.
Washington, DC  20049

       Counsel for Amicus-appellant American Association of
       Retired Persons

Robert N. Eccles, Esquire
Karen M. Wahle, Esquire
O'Melveny & Myers
555 13th Street, N.W.
Suite 500 West
Washington, DC  10004

       Counsel for Amicus-appellees:  ERISA Industry
       Committee, American Standard Inc., Bethlehem Steel
       Corp., Merck & Co., Inc., Rockwell International Corp.,
       Scott Paper Company, and USX Corporation

_____

OPINION OF THE COURT

_____


MANSMANN, Circuit Judge.

This consolidated class action is brought pursuant to the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 et seq. (1985 & Supp. 1995), and arises out of the collapse in 1991 of the Executive Life Insurance Company of California.  The plaintiffs, participants in individual account pension plans that Unisys Corporation maintained for its employees, alleged, inter alia, that the defendants breached ERISA's fiduciary duties of prudence and diversification by

investing plan assets in Executive Life guaranteed investment contracts, as well as ERISA's fiduciary duty of disclosure by providing participants with misleading or incomplete communications regarding these investments and Executive Life's financial condition. In their defense, the defendants raised a question of first impression, asserting that section 1104(c) of the Act, which relieves fiduciaries of liability for losses which result from a plan participant's exercise of control over individual account assets, applies. The plaintiffs appeal the district court's decision to grant the defendants' motion for summary judgment on the plaintiffs' breach of fiduciary duty claims.

We conclude that there are genuine issues of material fact as to whether the defendants breached section 1104(a)'s fiduciary duties and as to whether the defendants are entitled to section 1104(c)'s protection. We will, therefore, vacate the district court's grant of summary judgment in the defendants' favor and will remand the case to the district court for further proceedings.

I.

We begin our analysis by reviewing the evidence of record. In the fall of 1986, Burroughs Corporation and Sperry Corporation merged to form Unisys. Prior to the merger, both Sperry and Burroughs had maintained retirement savings plans for employees known as the Sperry Retirement Program – Part B (the "Sperry Plan") and the Burroughs Employees Savings Thrift Plan

8

(the "BEST Plan"), respectively. Each plan permitted an employee to contribute a percentage of his or her compensation into an individual account and to direct that it be invested in any one or a number of funds that were comprised of different types of investments. One of the funds in both of these plans invested in guaranteed investment contracts ("GICs") issued primarily by insurers. A GIC is a contract under which the issuer is obligated to repay the principal deposit at a designated future date and to pay interest at a specified rate over the duration of the contract.

Following the merger, the Sperry Plan and the BEST Plan were consolidated to form the Unisys Savings Plan, which took effect on April 1, 1988.[0] Like its predecessors, the Unisys Savings Plan established an individual account for each participant and offered several fund alternatives into which a

---

[0]    The parties agree that the Unisys Savings Plan is an "individual account plan" within the meaning of the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 et seq. (1985 & Supp. 1995). Section 1002(34) of the Act provides:

### § 1002. Definitions

(34) The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34).

participant could direct contributions on a tax-deferred basis: the Diversified Fund, the Indexed Equity Fund, the Active Equity Fund; the Unisys Common Stock Fund; the Short Term Investment Fund, and the Insurance Contract Fund.[0]

The Insurance Contract Fund invested in GICs.  The old Sperry Plan Fixed Income Fund, a vehicle for GICs, continued to exist, but was closed to new contributions.  As GICs matured, assets invested in the Fixed Income Fund were reinvested in the new Insurance Contract Fund; assets in the BEST Plan equivalent, the Guaranteed Investment Contract Fund, were likewise reinvested in that Fund, unless a participant specified otherwise.[0] Contributions to the Insurance Contract Fund were allocated on a pro rata basis among the various GICs held therein.

The Unisys Savings Plan allowed a participant to transfer assets from one equity fund to another on a monthly basis.  Due to transfer limitation terms that were included in the contracts purchased for the GIC Funds, however, asset transfers involving those Funds were restricted.  For example, all transfers between any of the GIC Funds and the Short-Term Investment Fund, another low-risk, interest-earning vehicle, were absolutely prohibited.  Moreover, if assets were transferred from

---

[0]     The Plan also accepted "after-tax" and "tax-deductible" contributions that had been made under the prior plans as well as transfers from other qualified plans or individual retirement accounts.  The Plan further provided for matching company contributions in the form of shares of Unisys common stock.

[0]     For the sake of convenience, the BEST Plan Guaranteed Investment Contract Fund, the Sperry Plan Fixed Income Fund, and the Unisys Savings Plan Insurance Contract Fund will be referred to collectively as the "GIC Funds".

one of the GIC Funds to the equity or Unisys common stock funds, a year had to pass before any assets could be transferred to the Short-Term Investment Fund; similarly, if assets were transferred from the equity or the Unisys common stock funds to the Short-Term Investment Fund, a year had to transpire before any assets could be transferred out of one of the GIC Funds.[0]

Because the Plan was designed to make final distribution of a participant's account on retirement, death, disability or employment termination, withdrawals of tax-deferred contributions prior to those events were limited to circumstances of "financial hardship" and were generally taxable as ordinary income, plus 10%.

In addition to the Unisys Savings Plan, Unisys established the Unisys Retirement Investment Plan ("RIP") and the Unisys Retirement Investment Plan II ("RIP II") for unionized employees, which for all intents and purposes were identical to the Unisys Savings Plan.[0] Contributions to the Plans designated for investment in the Fixed Income Fund or the Insurance Contract Fund were invested together.

---

[0] In addition, the Plan placed a six-month restriction on the transfer of assets to the Insurance Contract Fund from the equity or Unisys common stock funds if those assets had been previously transferred from the Short-Term Investment Fund, as well as several other restrictions of six months or a year's duration when transfers were made to or from the Best Plan Guaranteed Investment Contract Fund or the Sperry Plan Fixed Income Fund.

[0] Again, for the sake of convenience, the Unisys Savings Plan, the Unisys Retirement Plan ("RIP") and the Unisys Retirement Plan II ("RIP II") will be referred to collectively as the "Plans".

11

Unisys was the Plans' administrator; the Administrative Committee, established by the Unisys Board of Directors, carried out the Plans' provisions; and the Investment Committee, also established by the Board, was responsible for the Plans' investments. The Investment Committee delegated day-to-day investment management responsibility for the GIC Funds to two of the Investment Committee's members, defendants David White and Leon Level, and appointed outside managers to manage investments in the Plans' other funds.

From time to time White and certain members of his staff, including William Heller, Robert Rehley and Charles Service, conducted a bid among insurers during which GIC contracts were selected for the appropriate GIC Fund. These selections were subject to Level's approval and reported to the Investment Committee. White and his staff did not have written guidelines for the bidding process or contract selection; they did, however, have informal operating policies and procedures. In particular, they developed a rule that no more than 20% of GIC Fund assets would be invested with any one issuer.

After the merger in 1986, but before the effective date of the Plans in April, 1988, two bids for the Fixed Income Fund were held. The first bid occurred on June 9, 1987, in the offices of Murray Becker of Johnson & Higgins, a consultant which Sperry had used to assist in GIC selections. Prior to bid day, Becker mailed bid specifications on Unisys' behalf to a number of insurers, including the Executive Life Insurance Company of California, inviting them to make a GIC proposal. It was Johnson

12

& Higgins' practice to solicit bids only from insurers with a superior AAA rating as to claims-paying ability from Standard & Poors Corporation. At the time, Standard & Poors had rated Executive Life as a AAA company. Likewise, A. M. Best Company, another rating agency, had assigned Executive Life its highest rating of $A^+$. According to Becker, however, the $A^+$ from A. M. Best was of marginal significance since A. M. Best was overly generous with its ratings.

On the day of the bid, White, his staff and Becker reviewed material that Executive Life provided concerning the insurer's financial condition and interviewed Executive Life representatives about the company's outlook. The group then discussed the Executive Life GIC proposal. As was his custom, Becker noted that the prospect of purchasing Executive Life GICs was "controversial" in light of the "junk bonds" Executive Life held in its portfolio. Junk bonds are non-investment securities which carry an above-average credit risk and return. Taking their cue from Standard & Poors, which was of the view that the risk generated by Executive Life's junk bond investments was offset by other conservative aspects of the insurer's investment strategy, White and his staff were not deterred from investing in Executive Life. Becker warned, however, that the Standard & Poors AAA rating was reliable only as long as Executive Life's junk bond holdings did not exceed 35% of its bond portfolio. Ultimately, Becker recommended that Unisys consider the purchase of a three-year GIC from Executive Life. While White accepted Becker's advice to invest in Executive Life, he rejected Becker's

13

view as to the contract's duration. In order to acquire the highest interest rate that Executive Life offered, 9.45%, White purchased a five-year Executive Life GIC for approximately $30 million. GIC bids from Travelers Insurance Company and Seattle First Bank were also accepted.

Subsequent to the June 9, 1987 bid, White and Level terminated Johnson & Higgins and did not hire a replacement, believing that Unisys personnel could select appropriate GICs without the help of a consultant. A second competitive GIC bid for the Fixed Income Fund took place on December 2, 1987. Relying heavily on Executive Life's ratings, which had not changed since June 9, 1987, White invested just over $135 million into another five-year Executive Life GIC paying 9.75% in interest. Contracts were purchased from Seafirst Bank and Travelers Insurance Company as well, bearing interest rates of 9.25% and 9.15% respectively.

Shortly thereafter, on January 13, 1988, Unisys sponsored a GIC bid for the Insurance Contract Fund. Once again, based on the high marks Executive Life continued to receive from the rating agencies, White invested about $46 million in a third five-year, 9.48% interest-paying Executive Life GIC, bringing the total investment in GICs issued by Executive Life to $213 million.

Communications to participants regarding the GIC Funds, beginning with BEST Plan and Sperry Plan documents, described the Funds as designed to preserve capital and accumulate interest and consistently emphasized that investments in GICs were "guaranteed" by the issuing insurers. BEST Plan materials stated

14

that the goal of the Guaranteed Insurance Contract Fund was "to preserve the amount invested and to guarantee a rate of return", and provided that "[i]n addition to the interest earned, the insurance company guarantees the principal of the fund[] . . . [and that] your account cannot go down in value; it will always be worth as much as you put in plus your share of the interest earned under the contract."  Similarly, with respect to the Fixed Income Fund, Sperry Plan materials declared that "each year's minimum [interest] rate is guaranteed for an entire year."

Likewise, the prospectuses for the Plans, distributed in the Spring of 1988, stated that the Insurance Contract Fund was intended "to preserve capital while earning interest income[]" and described the Fund as "invested in contracts with insurance companies and other financial institutions which guarantee repayment of principal with interest at a fixed or fixed minimum rate for specified periods. . . ."  The Unisys Savings Plan prospectus noted, however, that "[Unisys] does not guarantee the repayment of principal or interest."  Although the 1988 RIP and RIP II original prospectuses did not include this caveat, it was subsequently included in a 1988 supplement to each.  Additionally, the Plans' prospectuses pointed out that assets of the Insurance Contract Fund were invested in contracts issued by, inter alia, Executive Life.

The 1988 Summary Plan Descriptions ("SPD"s) for the Plans provided that the investment objective of the Insurance Contract Fund was to "[p]reserve the amount invested while earning interest income[]", described the Funds' investment

15

strategy as "[t]ypically contracts of between 3 and 7 years with various insurance companies and other financial institutions which guarantee the principal and a specified rate of return for the life of each contract", and explained that the future performance of any of the funds was not certain:

> [b]enefits available are based on your savings plan value at the time of distribution.  Your payments from the Plan are subject to the performance of the funds in which your accounts are invested.  If the value declines, you may receive less from the Plan than you and the Company contributed.

With respect to the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 et seq. (1985 & Supp. 1995), the 1988 and 1990 prospectuses for the Plans pointed out: the Plan is subject to some, but not all, of the provisions of the [Act] . . . which [a]mong other things . . . set minimum standards of fiduciary responsibility, establish minimum standards for participation and vesting, and require that each member be furnished with an annual report of financial condition and a comprehensive description of the member's rights under the Plan.

The Plans' SPDs informed the participants:

> you are entitled to certain rights and protections under [ERISA] . . . .  In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of employee benefit plans.  The people who operate the [Unisys Savings Plan, the Unisys Pension Plan, RIP, and RIP II], called `fiduciaries' of the Plans, have a duty to [operate] prudently, in your interest and that of all members and beneficiaries.

After the prospectuses and the SPDs were distributed, the Investment Committee received correspondence in 1988 and 1989 from individual participants, including Henry Zylla, the

16

president of one of Unisys' local unions who wrote on behalf of the union's members, questioning whether Executive Life GICs should have been purchased for the Plans, given the insurer's high risk investments. In responding correspondence, Unisys stated that the Committee did not invite "risky" companies to its GIC bids, that its GIC selection process continuously emphasized "safety" and that all of the contracts it selected for the GIC Funds carried investment-grade credit ratings.

In January of 1990, some two years after Unisys' last Executive Life GIC purchase, Executive Life announced that it had written down $515 million in assets due to losses in its bond portfolio. Following this announcement, Executive Life's credit ratings were lowered from AAA to A by Standard & Poors; from $A^+$ to A by A. M. Best; and from A1 to BAA2 by a third rating company, Moody's Investors Service.

Concerned that a flood of policy and other contract surrenders would cause a liquidity crisis that it would be unable to overcome, Executive Life began meeting with its investors to discuss its financial condition. When representatives of Executive Life and Unisys met on January 31, 1990, Executive Life articulated reasons for asserting that it would continue to meet its obligations and survive intact the situation it faced.

The next day, Thomas Penhale, an employee in Unisys' Human Resources department, sent to defendant Michael Losey, a Vice President of Human Resources, a copy of a newspaper article on Executive Life with a hand-written note, stating: "[defendant] John L[oughlin] got this today. It is not as `comforting' as

17

Exec[utive] Life led us to believe yesterday." In a memorandum to the Investment Committee dated February 2, 1990, however, White, who attended the January 31 meeting with Executive Life, expressed the view that the insurer "appears to be in reasonably good shape to weather the storm."

On February 5, 1990, members of the Investment Committee and other interested Unisys personnel met to discuss, inter alia, the questions Unisys had received from participants regarding Executive Life's status and the disclosures the company would make to the Plans' participants about the insurer. After some debate, the group decided that Unisys would disseminate information to all participants regarding Executive Life's condition through an updated prospectus and an accompanying cover letter.

In late March, 1990, Unisys sent to each participant a revised prospectus which stated generally that "an investment in any of the investment funds involves some degree of risk[]" and that many factors, including the "financial stability of the institutions in which assets are invested, the quality of the investment portfolios of those institutions, and other economic developments will affect . . . the value of a [participant's] investment in those funds." In bold letters, the prospectuses added that "[a]s a result, there is no assurance that at any point in time the value of an investment in any fund will not be lower than the original amount invested."

As for the Insurance Contract Fund, the revised prospectus stated that its "objective . . . is to preserve

18

capital while earning interest income[]", characterized its investments as "contractual obligation[s]" of the issuer, and pointed out that the "repayment of principal and interest is necessarily subject to the [issuer's] ability to pay . . . [such that] a downturn or loss in one or more areas of the [issuer's] investment portfolio could have an adverse effect on the stability of the [issuer]."  Like the April 1, 1988 prospectus, the revised prospectus stated that "[Unisys] does not guarantee the repayment of principal or interest[]"; it also informed participants that the Investment Committee's guidelines required that Unisys purchase GICs from insurers rated "Secure" by Standard & Poors, or "Highest Investment Quality" by Moody's Invest[ors] Service, or "Superior" or "Excellent" by A. M. Best, but that "[c]ontracts issued by an insurance company or other institution whose rating is downgraded subsequent to selection may continue to be held in the fund."  Finally, Executive Life was identified as one of the companies from which GICs had been purchased.

With the 1990 prospectus, participants received a letter from defendant Jack A. Blaine, a Vice President of Human Resources, encouraging participants to review the prospectus carefully and reminding them that Unisys would not give advice as to appropriate investment strategy.  The letter responded to questions concerning the "troubled `junk bond' market and the effect, if any, that such problems would have on the [GIC Funds]" by pointing out that the repayment of principal and interest under GICs necessarily and entirely depended on the ability of

the insurer to meet its obligations; that Unisys did not guarantee the repayment; and that the financial stability of an insurer depended on the success of its own portfolio, such that an investment in junk bonds could have an adverse effect on financial stability.  Lastly, the letter provided that only those institutions with a "secure" credit rating at the time of a contract bid would be selected for investment.

Although a draft of Blaine's letter had made specific mention of Executive Life, the letter the participants eventually received did not.  The draft's reference to Executive Life's $515 million asset writedown was removed; a statement disclosing the magnitude of the proportion of Fixed Income and Insurance Contract Fund investments in Executive Life was crossed out because it "could cause panic"; and a statement about informative news articles was deleted because it "could cause more concern." A comment on the draft stated:  "The overall content and tone do [not] sooth[e] any fears and may in fact stir more interest in this subject than it deserves."

Blaine's letter was accompanied by an enclosure that listed all of the GICs held in the GIC Funds at that time, with investment value, maturity dates, and the bid day and current ratings of the issuing insurer.  The enclosure revealed that Executive Life GICs had a combined book value of over $200 million, maturity dates of June, 1991, June and September, 1992, and March, June and August, 1993.  It also showed the recent decline in ratings that Executive Life had suffered.  The 1990 prospectus and the letter from Blaine with the enclosure were the

only communications Unisys made to all participants on a systematic basis subsequent to Executive Life's January, 1990 announcement.

At about the same time, Unisys distributed to its benefits administration personnel a copy of a February 23, 1990 letter from Fred Carr, Executive Life's Chairman and President, which portrayed the company as "healthy", "financially strong", and "capable of providing all the benefits promised[]", and written responses to specific questions about Executive Life for use in addressing concerns that individual participants directed their way. According to Losey's deposition testimony, individual participants who asked employees in the Human Resources department "[w]ell, gee, how many people ever lost their money in this kind of thing[?]" would be told, "I don't remember one time they even halfway defaulted." In March, 1990, Unisys also met with union employees and responded to participants' inquiries about Executive Life's financial status.

Unisys did not, however, disclose two decisions it had reached: one involving its chairman's retirement annuity and the second, an Investment Committee resolution. With respect to the first, a few months after sending the revised prospectus to participants, Unisys replaced a $500,000 retirement annuity issued by Executive Life for Unisys' then Chairman, Michael Blumenthal, with an annuity from another insurer at some expense to the company. The second matter occurred at an Investment Committee meeting on August 10, 1990, during which was discussed, inter alia, the course of action the Plans would take in the

21

event of a Executive Life default. The Committee ultimately resolved "that in the event of a default in any of the guaranteed investment contracts . . . distribution to plan participants will be reduced by that portion of the participant's account held in the defaulted contract."

Seeking to reduce the waiting period for asset transfers between "non-competing" funds and the GIC Funds from twelve months to six, Unisys contacted the issuers from whom GICs had been purchased and asked that they agree to appropriate contract modifications. In exchange for Executive Life's consent to a waiting period reduction in the contracts it had issued to the Plans, Unisys executed a letter agreement on October 17, 1990 which provided in pertinent part:

> Unisys Corporation hereby further agrees that neither it nor its affiliates, employees, agents or other representatives will communicate with Plan participants regarding the financial condition or prospects of Executive Life nor issue any other communication regarding Executive Life which could be reasonably viewed as attempting to influence the investment choices of Plan participants without first obtaining Executive Life's written approval of such communication. In the event such prior written approval is not obtained, Executive Life may elect to not honor employee requests for withdrawals or reallocations provided that Executive Life reasonably believes that such requests were the direct result of such communication.

During this time, Executive Life's condition was widely reported in the financial press. Eventually, on April 11, 1991, the California Commissioner of Insurance seized Executive Life,

22

placing it in conservatorship, and on April 12, 1991, issued a moratorium on all payments from the insurer. As a result, Unisys isolated and froze the balance in any participant account invested in Executive Life by way of the Fixed Income and/or Insurance Contract Funds. At this time, 30% of the Fixed Income Fund and 7% of the Insurance Contract Fund were invested with the insurer. On December 6, 1991, the Superior Court of California declared Executive Life insolvent.

In 1991, several classes composed of Unisys employees who participate in one of the Plans and have account balances invested in Executive Life and the unions which represent Unisys employees commenced twelve separate actions against Unisys, the Investment and Administrative Committees of the Unisys Board of Directors and individuals who allegedly had served on one or both of the Committees.

By Pretrial Order dated November 4, 1991, the twelve cases were consolidated for all purposes, except trial. Pursuant to this Order, on November 25, 1991, the plaintiffs filed a three count second amended consolidated class action complaint against the above-named defendants.[0] In Count I, all of the plaintiffs assert under sections 1045, 1104, 1105, 1109 and 1132 of ERISA, that Unisys breached fiduciary duties: by investing in Executive Life GICs; by failing to monitor the investments and divest them

---

[0]     In their briefs, the defendants refer to themselves collectively as "Unisys". We will adopt that designation from this point forward.

23

from the Plans;[0] by failing to diversify the GIC Funds' assets; and by failing to provide adequate disclosures to participants regarding "the composition of the portfolios" of the Fixed Income and Insurance Contract Funds and the "status of Executive Life's financial condition and the effect of [the insurer's] insolvency on their investment. . . ."  In Count II, they assert that Unisys violated ERISA's reporting and disclosure requirements set forth in sections 1021(a), 1022(a)(1),(b) and 1023(b) by not furnishing an adequate summary plan description and an annual or other periodic report which would have apprised the plaintiffs that investments in the Fixed Income and Insurance Contract Funds were in jeopardy due to Executive Life's financial condition.  In Count III, the union plaintiffs claim that Unisys' decision to invest in Executive Life and the actions it took when the insurer was placed in conservatorship breached certain collective bargaining agreements in violation of section 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 141 et seq. (1973 & Supp. 1995).

In answer to the plaintiffs' ERISA claims, Unisys denied the allegations in the second amended complaint and asserted by way of a defense that 29 U.S.C. § 1104(c), which provides in part that "no person who is otherwise a fiduciary shall be liable under [Part 4 -- Fiduciary Responsibility] for any loss, or by reason of any breach, which results from [a]

[0] It appears from the plaintiffs' briefs that they no longer pursue their allegations that Unisys breached fiduciary duties by failing to monitor the Executive Life investments and divest them from the Plans.

24

participant's or beneficiary's exercise of control [over the assets in his account]", relieves it of liability.

On July 22, 1994, Unisys filed a motion for summary judgment, requesting, inter alia, that judgment be entered in its favor as to all counts of the second amended complaint.

On January 25, 1995, the district court granted Unisys' motion on the plaintiffs' ERISA claims (Counts I and II) and denied the motion as to the union plaintiffs' Labor Relations Management Act claim (Count III).[0] In its opinion, the district court began its analysis with what it designated as the plaintiffs' ERISA "`Adequate Information' and Control Claim"; after setting forth the elements of an adequate summary plan description, the court turned immediately to Unisys' section 1104(c) defense. Considering whether the Plans' SPDs and

---

[0] In its motion for summary judgment, Unisys also requested that the plaintiffs' jury demand be stricken and argued that plaintiffs are not entitled to either punitive damages or other extra-contractual remedies under ERISA. Finding that the plaintiffs seek equitable relief under ERISA, the district court ruled that the plaintiffs are not entitled to a jury trial on Counts I and II. The court retained the union plaintiffs' jury trial demand on Count III because it held that the union plaintiffs' claim under the Labor Management Relation Act, 1947, 29 U.S.C. § 141 et seq. (1973 & Supp. 1995), raises a legal issue.

The plaintiffs did not appeal the court's decision to grant summary judgment on Count II or its decision to strike the jury trial demand on Counts I and II. Likewise, Unisys did not appeal the district court's denial of summary judgment or its refusal to strike the jury demand as to Count III.

The court did not address Unisys' contention that ERISA does not allow the plaintiffs to recover punitive or other extra-contractual damages. The parties have not raised this issue on appeal.

25

prospectuses provided "the specific warnings required by ERISA and case law to allow the participants to exercise control over their investments", the court concluded that Unisys had provided the "required information and warnings" by advising participants that "`[Unisys] does not guarantee the repayment of principal or interest[]'" and "[t]here were no guarantees on their investments." Noting that the Plans were "voluntary" and that "consistent with ERISA § 404(c), the plans gave participants the option to invest their contributions in one or more of six funds[]," with the SPDs stating that "`[y]ou direct how your before-tax contributions are invested[]'", the court also concluded that the participants had control over their assets.

Turning next to the plaintiffs' various claims in Count I for breach of ERISA's fiduciary duties, the district court disposed of the failure to disclose claim by holding that even though "`[t]he duty to disclose material information is the core of a fiduciary's responsibility'", a "`significant exception to the rules governing fiduciaries applies to plans that permit participants to exercise control over individual accounts assets.'"

With regard to the plaintiffs' assertion that the investment in Executive Life GICs was imprudent, the court ruled that "Unisys met the requirements of the `experienced prudent person[]'" having based its decision to invest in Executive Life on appropriate grounds:

> Unisys examined the financial statements of
> Executive Life, all of which indicated that
> it was sound. It sought the opinion of an

26

> expert, who advised that Executive Life was a
> good investment.  Most significantly, Unisys
> relied on the ratings of Standard & Poors and
> Moody's, both of which gave Executive Life
> high ratings of $A^+$ or AAA.  . . .  With all
> of the information available to it at the
> time, Unisys clearly made prudent business
> and investment decisions.  Plaintiffs cannot
> not now use 20/20 hindsight to impose
> liability on Unisys.

The district court did not address the plaintiffs' claim in Count I that Unisys failed to satisfy ERISA's duty of diversification.

Judgment on Counts I and II of the second amended complaint was entered on January 26, 1995, and this consolidated appeal by the plaintiffs followed.[9]

## II.

In examining the issues raised on appeal, we begin with settled principles of procedure involving summary judgment.[0]

---

[9]. Appeals in eleven of the twelve consolidated cases are from final judgments as the entry of summary judgment in Unisys' favor in those eleven finally resolved all of the claims between the parties.  In the twelfth action, where the union plaintiffs assert the Labor Management Relations Act claim, the district court's grant of summary judgment for the defendants on only the ERISA claims does not dispose of all the claims between the parties.  Accordingly, for purposes of appeal, the plaintiffs in that action sought the district court's certification pursuant to Fed. R. Civ. P. 54(b), which was granted.

Because the twelve cases were not consolidated for trial, even though the district court's order granting summary judgment to Unisys on Counts I and II of the second amended consolidated complaint does not dispose of all of the claims in the twelve consolidated actions, it is a final, appealable order within the meaning of 28 U.S.C. § 1291. Hall v. Wilkerson, 926 F.2d 311, 314 (3d Cir. 1991) (holding that the dispositive factor in determining whether an order disposing of less than all claims in a consolidated case is appealable is whether the consolidation was for all purposes).

Summary judgment should be granted where the record reveals that no genuine issue of material fact exists for resolution at trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  On summary judgment, the moving party need not disprove the opposing party's claim, but does have the burden to show the absence of any genuine issues of material

---

[0]      On review of the district court's award of summary judgment, we are required to apply the same test the district court should have used initially. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977).  When deciding a motion for summary judgment, a district court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations. Country Floors Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1991).  Even where a case will be heard without a jury, the court on summary judgment does not sit as the trier of fact; it only determines whether there are issues which must be tried. Medical Inst. of Minnesota v. National Ass'n of Trade and Technical Schools, 817 F.2d 1310, 1315 (8th Cir. 1987).  To raise a genuine issue of material fact the opponent need not match, item for item, each piece of evidence proffered by the movant. Big Apple, BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992), cert. denied, ___ U.S. ___, 113 S. Ct. 1262 (1993).  In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Id.  It thus remains the province of the factfinder to ascertain the believability and weight of the evidence. Id.

The party opposing the motion is entitled to have his allegations taken as true, to receive the benefit of doubt when his assertions conflict with those of the movant and to have inferences from the underlying facts drawn in his favor. Big Apple, BMW, 974 F.2d at 1362-63.  Ambiguities and conflicts in a deponent's testimony are generally matters for the fact-finder to sort out. Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 289 (8th Cir. 1988).  Any "unexplained gaps" in materials submitted by the moving party, if pertinent to the material issues of fact, justify denial of the motion. O'Donnell v. United States, 891 F.2d 1079, 1082 (3d Cir. 1989).

fact. <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 323 (1985). If the movant meets this burden, then the opponent may not rest on allegations in pleadings, but must counter with specific facts which demonstrate that there exists a genuine issue for trial. <u>Id.</u> Further, even if the facts are undisputed, summary judgment may not be granted where there is disagreement over inferences that can be reasonably drawn from those facts. As in this case, when the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the nonmoving party has not offered evidence sufficient to establish the existence of an element essential to its case. <u>Id.</u> at 322.

With these principles in mind, we turn first to the plaintiffs' claim that Unisys committed several breaches of ERISA's fiduciary duties. We turn second to Unisys' assertion that the defense set out in section 1104(c) applies in this case.

III.

Our analysis commences with the fiduciary responsibility provision of the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 <u>et</u> <u>seq.</u> (1985 & Supp. 1995). Section 1104(a) imposes several duties upon fiduciaries which include the duty of loyalty, the duty to act prudently, and the duty to diversify plan investments. Section 1104(a) provides in pertinent part:

**§ 1104. Fiduciary duties**

**(a) Prudent man standard of care**

29

**(1)** Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . .

. . . .

**(B)** with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

**(C)** by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[] . . .

29 U.S.C. § 1104(a)(1)(B),(C).

When we apply section 1104(a) to the facts of a particular case, we remain mindful of ERISA's underlying purposes:  to protect and strengthen the rights of employees, to enforce strict fiduciary standards, and to encourage the development of private retirement plans.  29 U.S.C. § 1001; H.R. Rep. No. 533, 93d Cong. 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 4639, 4639-43.  We also bear in mind that Congress has instructed that section 1104 "in essence, codifies and makes applicable to . . . fiduciaries certain principles developed in the evolution of the law of trusts."  S. Rep. No. 127, 93 Cong., 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 4838, 4865.

A.

30

In Count I of the second amended complaint, the plaintiffs allege, inter alia, that Unisys breached section 1104(a)(1)(B) by making imprudent investments of plan assets in Executive Life. Unisys contends that, to the contrary, the evidence establishes that the purchases of the Executive Life GICs were prudent under ERISA as a matter of law, thereby entitling it to summary judgment.

Under the common law of trusts, a trustee is duty-bound "to make such investments and only such investments as a prudent [person] would make of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived. . . ." Restatement (Second) of Trusts §227 (1959). Further, a trustee is required to use due care, which means he must investigate the safety of the investment and its potential for income by securing reliable information, and may take into consideration the advice of qualified others, as long as he exercises his own judgment; to use the skill of a man of at least ordinary intelligence; and to use caution, with a view to the safety of the principal and to the securing of a reasonable and regular income. Id. cmts. (a) – (c), (e). Whether a trustee has acted properly in selecting an investment depends upon the circumstances at the time when the investment is made and not upon subsequent events. Thus, if at the time an investment is made, it is an investment a prudent person would make, there is no liability if the investment later depreciates in value. Id. cmt. o.

31

Consistent with these common law principles, the courts measure section 1104(a)(1)(B)'s "prudence" requirement according to an objective standard, focusing on a fiduciary's conduct in arriving at an investment decision, not on its results, and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment. Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 917-18 (8th Cir. 1994); Fink v. National Savings and Trust Co., 772 F.2d 951, 955-56 (D.C. Cir. 1985); Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir.), cert. denied, 469 U.S. 1072 (1984); Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983), cert. denied, 464 U.S. 1040 (1984).  In addition, the prudence requirement is flexible, such that the adequacy of a fiduciary's independent investigation and ultimate investment selection is evaluated in light of the "`character and aims'" of the particular type of plan he serves. Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983), cert. denied, 467 U.S. 1251 (1984).[0]

In this case, our in-depth analysis of the evidence convinces us that Unisys has failed to carry its burden on summary judgment of showing the absence of any genuine issue of

---

[0]    Similarly, the Department of Labor regulation concerning the investment duties of ERISA fiduciaries provides that the requirements of section 1104(a)(1)(B) of the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. §1001 et seq. (1985 and Supp. 1995), are satisfied if fiduciaries give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment plays in that portion of the plan's investment portfolio. . . ."  29 C.F.R. § 2550.404a-1(b)(i).

material fact as to whether its course of conduct and decision to invest in five-year Executive Life GICs in June and December of 1987 and January of 1988 for the Fixed Income and Insurance Contract Funds satisfied ERISA's duty of prudence.

We begin with the most basic of ERISA's investment fiduciary duties, the duty to conduct an independent investigation into the merits of a particular investment. When David White, Unisys' Vice President of Capital Management and Trust Investments, was asked at his deposition to describe the evaluation he and his staff performed at the time of the June 9, 1987, bid to satisfy themselves that Executive Life was financially sound, he responded that they depended on the research that he "believed" Unisys' consultant, Johnson & Higgins, had completed:

Q.   Other than the financial information provided to you by the companies and the ratings of the agencies of which you just spoke, did you have any other review done of the financial status of the insurance companies that were bidding?

A.   I don't know how to answer that clearly, but what was done was we relied on Murray's staff, also. It was conducted at his office. He, in this case -- we had never bid Executive Life, you know, for the Burroughs plan and it was Murray's relationship in effect and he had done, I believe, independent research. Otherwise, he would not have recommended Executive Life to us. So we had that recommendation.

In his deposition, however, Murray Becker of Johnson & Higgins did not confirm that Johnson & Higgins provided research to White and his staff:

```
Q.  Did you have a research staff at Johnson
    & Higgins?

            *   *   *

A.  Research as to what?

            *   *   *

Q.  As to the insurance companies?

A.  Johnson & Higgins had a committee that I
    was not involved in that approved
    insurance companies that Johnson &
    Higgins was permitted to use.  This was
    general for property casualty and life
    companies across the board.

            *   *   *

Q.  Were there individuals at the company
    whose responsibility it was to analyze
    the credit worthiness of various
    insurance companies?

            *   *   *

A.  Johnson & Higgins didn't represent
    itself as a credit-rating agency so it
    did not provide a credit research
    service.  And in my part of Johnson &
    Higgins, we simply adopted a standard of
    recommending companies that were
    recommended -- that a client consider
    companies that had a Triple A rating,
    and not consider companies that didn't
    have a rating, or were rated below
    Triple A.
```

While we would encourage fiduciaries to retain the services of consultants when they need outside assistance to make prudent investments and do not expect fiduciaries to duplicate

34

their advisers' investigative efforts, we believe that ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary. In our view, a reasonable factfinder could infer from this evidence that Unisys failed to analyze the bases underlying Johnson & Higgins' opinion of Executive Life's financial condition and to determine for itself whether credible data supported Johnson & Higgins' recommendation that Unisys consider investing plan assets with the insurer. A reasonable factfinder could also conclude that Unisys passively accepted its consultant's positive appraisal of Executive Life without conducting the independent investigation that ERISA requires.

Likewise, the record calls into question the sufficiency of the investigation that White and William Heller and Robert Rehley, members of White's staff, conducted prior to the Executive Life GIC purchases that were made in December of 1987 and January of 1988. Although the services of Johnson & Higgins had been terminated and another consultant had not been hired, White testified he did "nothing new" by way of research into Executive Life's finances between June and December of 1987. Heller and Rehley, when deposed, indicated that in connection with these purchases, their task was to keep current Unisys files on bidding insurers up-to-date. If, as the record suggests, Unisys' investigation consisted of nothing more than confirming that Executive Life's credit ratings had not changed since June, 1987, a reasonable factfinder could find that the investigations for the second and final GIC purchase were deficient.

35

Of course, the thoroughness of a fiduciary's investigation is measured not only by the actions it took in performing it, but by the facts that an adequate evaluation would have uncovered. Fink, 772 F.2d at 962 (Scalia, J., concurring in part and dissenting in part) ("[T]he determination of whether an investment was objectively prudent is made on the basis of what the trustee knew or should have known; and the latter necessarily involves consideration of what facts would have come to his attention if he had fully complied with his duty to investigate and evaluate." (emphasis in original)). In this regard, the plaintiffs presented evidence which showed that one who investigated Executive Life in 1987 and 1988 would have found, for example, that Moody's Investors Service had given Executive Life a rating which was notably lower than those assigned by Standard & Poors and A. M. Best; that the higher ratings that Executive Life had received were being questioned in some financial circles; that at least one reputable consultant had strongly recommended against investments in Executive Life annuity contracts; and that Executive Life's reinsurance practices were under scrutiny by state regulators. The record, however, does not reveal which of these items Unisys may have considered, and raises a question as to what conclusion concerning an investment in Executive Life a prudent fiduciary would have reached had they come to its attention.

Turning to the credit ratings upon which Unisys admittedly relied in large measure to make and defend its decisions to invest in Executive Life, we observe that here, too,

36

the record raises genuine issues as to whether Unisys' reliance was justified and informed. As noted earlier, Becker advised White and his staff that a AAA rating from Standard & Poors was a valid indicator of Executive Life's economic vitality only if junk bonds did not exceed 35% of its bond portfolio. When deposed, Becker testified that Executive Life's representatives had reported in June of 1987 that the insurer met this standard; White, who was ultimately responsible for assessing Executive Life's prospects, however, was unable at his deposition to recall the percentage of the insurer's junk bond holdings at relevant times and guessed that the percentage was under "forty or fifty". Thus, whether White was, in fact, cognizant of this significant item of information when he decided to invest in Executive Life is for the factfinder to decide. Moreover, when Heller was asked during his deposition what he knew about the bases underlying Standard & Poors ratings, he testified to a limited understanding, stating that "[Murray Becker] was the most knowledgeable of anyone . . . of the methodology of Standard & Poors. We would not have been knowledgeable in that area." Whether the rating was a reliable measure of Executive Life's financial status under the circumstances and whether Unisys was capable of using the rating effectively are, therefore, matters which must be decided at trial. See Donovan v. Cunningham, 716 F.2d at 1474 ("An independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are fulfilled. It is a tool and like all tools, is useful only if used properly.").

37

When we focus on the five-year duration and interest terms of the Executive Life GICs, we find additional issues for trial. The record is uncontroverted that, in June of 1987, Becker advised in favor of the purchase of an Executive Life GIC of only three-years duration and that White did not heed his advice as to the contract's duration; the record does not resolve, however, whether the relative merits of these different maturity dates, which could have had a significant impact on the risk associated with the investment, were debated and to what result. Rehley recalled some discussion on the issue; Heller did not believe that such a discussion took place; and Becker could not remember whether any consideration, one way or the other, was given to the matter. We believe that if this debate did not take place, a reasonable factfinder could conclude that Unisys did not adequately deliberate its investment decision and that had it done so, it would have rejected a long-term investment in Executive Life. Moreover, that White sought to maximize interest rates by investing in the five-year GICs is not disputed; whether he inappropriately sacrificed security in making investments for Funds where the preservation of capital was of paramount concern is yet another issue for trial. The dramatic disparity between the interest rates that Executive Life offered and those offered by other successful bidders could lead a factfinder to infer that the risk accompanying Executive Life's yields was unacceptably high.

The record also raises a question as to whether Unisys was equipped to conduct GIC bids unassisted and whether the

38

absence of written guidelines for the bidding process impeded its ability to make prudent investment decisions. As noted, when questioned about credit ratings, Heller testified that he and his colleagues lacked a certain expertise, and when questioned about the "negative consequence" of the absence of written guidelines, he testified: "[T]here was the possibility that we would be placing money with companies that would subsequently run into trouble. There was also the fear that too much money could be with any one issuer."

Finally, we note a report prepared by George M. Gottheimer, Jr., an expert retained by the plaintiffs, opining that the purchases of long-term Executive Life GICs in 1987 and 1988 were imprudent.[0] According to Mr. Gottheimer, Unisys breached its fiduciary duties by not adequately investigating the financial condition of Executive Life, by not having guidelines against which to measure the insurer; by relying solely on the credit ratings Executive Life had received; by placing almost

---

[0] Unisys argues that we may not consider Mr. Gottheimer's report because it was not in the form of a sworn affidavit as required by the Fed. R. Civ. P. 56(e). Unisys, however, did not move to strike nor did it otherwise object to Dr. Gottheimer's report in the district court. Indeed, Unisys placed the report in the record.

We agree with the plaintiffs and our sister courts of appeals that Rule 56 defects are waived where they are not raised in the district court. See, e.g., Humane Soc. of The United States v. Babbitt, 46 F.3d 93, 96 n. 5 (D.C. Cir. 1995) (Rule 56 defects are waived where motions to strike are not filed); DeCintio v. Westchester County Medical Center, 821 F.2d 111, 114 (2d Cir.), cert. denied, 484 U.S. 965 (1987) (citing "unanimous accord" on the question in five other courts of appeals). We think this rule is especially applicable given that it was Unisys which submitted the report to the district court.

exclusive emphasis on yield; and by not employing the services of a consultant for all of the purchases in view of its lack of knowledge and skill.  Mr. Gottheimer's opinion, based on his interpretation of the deposition testimony and exhibits he reviewed, is itself some evidence of Unisys' imprudence, capable of defeating Unisys' motion for summary judgment.

We thus conclude that in response to Unisys' motion for summary judgment, the plaintiffs raised genuine issues of material fact to support their claim that the investment of plan assets in Executive Life GICs violated section 1104(a)(1)(B)'s duty of prudence.


B.

We turn next to the plaintiffs' claim in Count I that Unisys violated ERISA's fiduciary duty set forth in 29 U.S.C. §1104(a)(1)(C), to "diversify[] the investments in the plan so as to minimize the risk of large losses", by placing an excessive amount of plan assets in Executive Life GICs.

As a general proposition, ERISA's duty to diversify prohibits a fiduciary from investing disproportionately in a particular investment or enterprise.  A Congressional Committee report on the Act's diversification provision provides:
> A fiduciary usually should not invest the whole or an unreasonably large proportion of the trust property in a single security. Ordinarily the fiduciary should not invest the whole or an unduly large proportion of the trust property in one type of security or in various types of securities dependent upon the success of one enterprise or upon

40

conditions in one locality since the effect is to increase the risk of large losses.

H.R. Conf. Rep. No. 1280, 93d Cong., 2d Sess. (1974), <u>reprinted in</u> 1974 U.S. Code Cong. & Admin. News 5038, 5085.[0]

ERISA's duty to diversify is not measured by hard and fast rules or formulas.  Congress has instructed that "[t]he degree of investment concentration that would violate this requirement to diversify cannot be stated as a true percentage, because a prudent fiduciary must consider the facts and circumstances of each case.  The factors to be considered include (1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of

---

[0]    Section 1104(a)(1)(C) of ERISA in large part reflects the fiduciary duty set forth in the Restatement (Second) of Trusts:

> **§228.  Distribution of Risk of Loss**
>
> **Except as otherwise provided by the terms of the trust, the trustee is under a duty to distribute the risk of loss by reasonable diversification of investments, unless under the circumstances it is prudent not to do so.**
>
>         \*   \*   \*
>
> **Comment:**
>     *a.  Duty to diversity investments.*  The trustee is under a duty to the beneficiary to exercise prudence in diversifying the investments so as to minimize the risk of large losses, and therefore he should not invest a disproportionately large part of the trust estate in a particular security or type of security.  It is not enough that each of the investments is a proper investment. . . .

Restatement (Second) of Trusts, § 228, cmt. a (1959).

41

investment, whether mortgages, bonds or shares of stock or otherwise; (5) distribution as to geographic location; (6) distribution as to industries; (7) the dates of maturity." Id. at 5085. Further, the Act's legislative history informs that a plan may invest wholly in insurance or annuity contracts, since generally an insurance company's assets are to be invested in a diversified manner. Id. Finally, if a plaintiff proves a failure to diversify, the burden shifts to the defendant to demonstrate that nondiversification was nonetheless prudent. Id. at 5084.

Before we consider the substance of the plaintiffs' failure to diversify charge and whether summary judgment was properly entered in Unisys' favor, we must determine how the duty set forth in section 1104(a)(1)(C) is measured in the context of the kind of Plans before us, which are comprised of a number of discrete funds, each with its own distinct type of investment. Not surprisingly, the parties maintain diametrically-opposed positions on the issue: Unisys argues that we must measure diversification by considering all of the investments the Plans hold, and the plaintiffs urge evaluation of diversification by considering the investments solely in the Fixed Income and Insurance Contract Funds.

Looking first to ERISA's language, we find little guidance; the Act refers only to a fiduciary's duty to diversify the "plan's" investments. 29 U.S.C. § 1104(a)(1)(C). ERISA's legislative history, however, indicates that a fiduciary's performance of the duty may be measured by the diversity it has

42

achieved in a particular investment vehicle and, where the management of a plan's investments is distributed among several managers, in the segment of the plan for which it has responsibility. Congress stated:

> [A]lthough the fiduciary may be authorized to invest in industrial stocks, he should not invest a disproportionate amount of the plan assets in the shares of corporations engaged in a particular industry. If he is investing in mortgages on real property he should not invest a disproportionate amount of the trust in mortgages in a particular district or on a particular class of property so that a decline in property values in that district or of that class might cause a large loss.
>
> An investment manager, A, is responsible for 10% of the assets of a plan and is instructed by the named fiduciary or trustee to invest solely in bonds; another investment manager, B, is responsible for a different 10% of the assets of the same plan and instructed to invest solely in equities. . . . In these circumstances, A would invest solely in bonds in accordance with his instructions and would diversify the bond investments in accordance with the diversification standard, the prudent man standard, and all other provisions applicable to A as a fiduciary. Similarly, B would invest solely in equities in accordance with his instructions and these standards.

H.R. Cong. Rep. No. 1280, reprinted in 1974 U.S. Code Cong. & Admin. News at 5084.

In addition to Congress' direction, we believe the case of GIW Indus., Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc., 895 F.2d 729, 733 (11th Cir. 1990), is instructive. There the plaintiff maintained a profit sharing plan for its employees which consisted of three funds. Plan participants allocated

their respective account balances among the funds and were permitted to change their investment election or to withdraw from the plan once a year.  The plaintiff hired the defendant to manage the investments of Fund A, an asset allocation account which was invested in fixed income securities, equities of publicly traded companies and money market instruments.  The defendant adopted a strategy to invest Fund A assets in primarily long-term government bonds, which were highly liquid and carried a minimal credit risk.  Due to a series of required cash disbursements, however, the defendant was required to sell Fund A assets at a loss.  The plaintiff filed suit, alleging that, inter alia, the defendant breached its fiduciary duty under ERISA to diversify the Fund's investments.

On appeal from the judgment entered against it, the defendant argued that its obligation to diversify was properly measured by considering the investments of the entire plan, not merely the investments in Fund A.  The court of appeals disagreed and affirmed the judgment, reasoning:

> It is undisputed, though, that [the defendant] exercised no control over any fund other than Fund A.  Moreover, Fund A could not draw upon the other funds for the purpose of cash pay-outs.  Even if the entire plan were to be considered in determining whether the diversification requirement has been met, [the defendant] made no investigation of the other funds, either.  Mr. Burton, whose testimony the district court credited, declared that the existence of Fund D did not influence how [the defendant] invested the assets of Fund A.

Id. at 733.

44

Although the facts in this case and GIW Industries differ in certain respects,[0] we find the approach taken by the Court of Appeals for the Eleventh Circuit applicable, persuasive, and in keeping with Congress' intent in section 1104(a)(1)(C). Here, as there, Unisys was responsible for investing a portion of the Plans' assets in designated investments. Similarly, the investments that other managers made for the Plans in other investment areas had no bearing on the investment choices Unisys made for the Funds it managed. Moreover, plan-wide investments were not available (and it would appear could not be available) to offset losses sustained by the Fixed Income and Insurance Contract Funds as a result of Executive Life's failure. Thus, the risk of loss which section 1104(a)(1)(C) aims to minimize was not distributed among the Plans' total holdings; it was, instead, spread only among the GIC Funds' contracts. We, therefore, conclude that under these circumstances, Unisys' satisfaction of the duty to diversify is properly assessed by examining the concentration of Executive Life investments in the Fixed Income and Insurance Contract Funds.

Because the record is incomplete in critical respects, however, we cannot determine whether Unisys is entitled to

---

[0]    We note that the fund at issue in GIW Indus., Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc., 895 F.2d 729 (11th Cir. 1990), in contrast to the GIC Funds here, was, by definition, to include a variety of investment types -- fixed income securities, equities of publicly traded companies and money market instruments. Id. at 730. Thus, it would seem that the defendant's investment strategy -- to invest primarily in long-term bonds -- violated the funds inherent diversification requirement. In our view, this fact difference is not significant to our analysis.

45

summary judgment on this aspect of the plaintiffs' case.  For example, as the record does not reveal the rationale for Unisys' rule not to place more than 20% of GIC Fund assets with a single issuer, the process by which Unisys may have applied the rule to the GIC purchases at issue, or the analysis that Unisys may have undertaken of the factors Congress has directed prudent fiduciaries to consider, we cannot decide whether reasonable minds could differ as to the adequacy of Unisys' actions with regard to diversification.  We are also left to ponder how Unisys attempted to maintain a steady degree of diversification where due to the reinvestment of proceeds from the Fixed Income into the Insurance Contract Fund, the percentage of assets in Executive Life contracts in each Fund changed over time or why, as White testified, Unisys assessed diversification according to the Funds' aggregate exposure to Executive Life, and not according to the exposure in each Fund.[0]  Moreover, assuming that the concentration of assets placed with Executive Life in the Fixed Income or the Insurance Contract Fund was excessive, the record does not reveal whether, as section 1104(a)(1)(C) permits, there may have been special circumstances excusing Unisys from diversifying GICs.  Finally, by its terms, ERISA requires a fiduciary to diversify so as to avoid "large losses". Because the

---

[0]     In December of 1988, the record shows that 21.7% of the Fixed Income Fund and 19.18% of the Insurance Contract Fund were invested in Executive Life; as of March 31, 1991, shortly before the plaintiffs' account balances were frozen, 30% of the Fixed Income Fund and 7% of the Insurance Contract Fund were invested in the insurer, with exposure on an aggregate basis at about 15%.

amount of losses the Fixed Income and Insurance Contract Funds will ultimately suffer has remained uncertain, the district court stayed discovery on the issue of damages; the summary judgment materials submitted to the district court by the parties were, by order, limited to liability issues.  We further understand that discovery on damages issues proceeded after Unisys' summary judgment motion was filed.  Obviously, whether "large losses" were avoided and in turn, whether Unisys satisfied its burden on summary judgment as to the duty to diversify, cannot be determined on the record before us.

We, therefore, conclude that Unisys' request for summary judgment in its favor on the plaintiffs' section 1104(a)(1)(C) failure to diversify claim was premature.  Upon remand, the record may be developed and a motion for summary judgment may be judged on the basis of the principles we have set forth.

C.

We now turn our attention to the plaintiffs' claim in Count I that Unisys breached section 1104(a)'s fiduciary duty to disclose.  As we understand it, the plaintiffs' claim is that Unisys misrepresented the risks associated with investing monies in the Fixed Income and Insurance Contract Funds through misleading or incomplete communications regarding the Funds' portfolio once the Executive Life GICs had been purchased, as well as Executive Life's financial condition in 1990.  In view of the district court's ruling that Unisys' disclosure obligations

47

are defined solely by section 1104(c), the threshold issue we must consider is whether the plaintiffs' claim under section 1104(a) may continue.

Looking for guidance to our cases regarding ERISA's fiduciary duty to inform, we note that we have repeatedly held that a fiduciary may not materially mislead those to whom section 1104(a)'s duties of loyalty and prudence are owed. In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 57 F.3d 1255, 1261 (3d Cir. 1995); Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 238 (3d Cir. 1994); Bixler v. Central Pennsylvania Teamsters Health and Welfare Plan, 12 F.3d 1292, 1300 (3d Cir. 1994); Fisher v. Philadelphia Elec. Co., 994 F.2d 130, 135 (3d Cir.), cert. denied, ___ U.S. ___, 114 S. Ct. 622 (1993). Thus, in Fisher, where the plaintiffs alleged that the defendant misrepresented its intention to establish a "retirement sweetener", we held that under section 1104(a) "[a] plan administrator may not make affirmative material misrepresentations to plan participants when asked about changes to an employee pension benefits plan. Put simply, when a plan administrator speaks, it must speak truthfully." 994 F.2d at 135. We also concluded that a misrepresentation was "material" if there was a "substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire." Id. Because the content of the communications at issue and whether such communications constituted affirmative, material misrepresentations were

48

questions of fact, we reversed the summary judgment that had been entered for the defendant and remanded the case for trial.  Id.

Shortly thereafter, in Bixler v. Central Pennsylvania Teamsters Health and Welfare Fund, 12 F.3d 1292 (3d Cir. 1994), where the plaintiff claimed that her deceased husband's employer had engaged in repeated misrepresentations that prevented her from electing to continue medical coverage under COBRA, we considered "to what extent a fiduciary's alleged misinformation or failure to provide relevant information constitutes a breach of fiduciary duty under § [11]04(a)."  Id. at 1300.  Guided by, inter alia, section 173 of the Restatement (Second) of Trusts,[0] we concluded that "[the] duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful."  Id.  We acknowledged that "the duty recognizes the disparity of training and knowledge that potentially exists

---

[0]     Under the Restatement (Second) of Trusts:

> d.  Duty in the absence of a request by the beneficiary.  Even if the trustee is not dealing with the beneficiary or the trustee's own account, he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person.

Restatement (Second) of Trusts § 173, cmt. d, cited in, Bixler v. Central Pennsylvania Teamsters Health and Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1994).

between a lay beneficiary and a trained fiduciary[]", and we further concluded that "the fiduciary's obligations will not be excused merely because [the beneficiary] failed to comprehend or ask about a technical aspect of the plan." Id. Finding evidence from which a trier of fact could have inferred that the employer knew that the plaintiff was left with substantial unpaid medical expenses and that she could have received reimbursement for those expenses under the employer's plan by signing and returning the COBRA notice her husband received, we viewed the employer's failure to advise the plaintiff of COBRA coverage as a potential breach of fiduciary duty. This was so even though the plaintiff contacted the employer while the COBRA election period was open and inquired only about the availability of death benefits. Id. at 1302. Thus, we held: "[I]f indeed [the employer] was acting in a fiduciary capacity, it acted under a duty to convey complete and accurate information that was material to [the plaintiff's] circumstance. Her circumstance was clearly broader than her inquiry". Id. at 1302-03. Reversing the grant of summary judgment for the defendant and remanding, we instructed the district court to determine whether "`material information' may have included more than the mere fact that the [employer] did not offer life insurance . . . ." Id. at 1303.

Most recently, In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 57 F.3d 1255 (3d Cir. 1995), we reaffirmed that an ERISA fiduciary has a duty under section 1104(a) to convey complete and accurate information when it speaks to participants and beneficiaries regarding plan benefits.

50

There retired employees were informed by summary plan descriptions and company representatives that they had lifetime medical benefits. Nonetheless, relying on a reservation of rights clause in the plans that gave it the right to terminate "at any time" or for "any reason", the company announced its decision to terminate all existing medical benefits plans and replace them with a new plan that altered post-retirement medical benefits in substantial measure. The retirees filed a class action against the company, asserting, inter alia, that the company breached its fiduciary duty under ERISA by affirmatively misleading plan participants about the duration of their retiree medical benefits. Noting that our prior decisions "firmly establish that when a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries", id. at 1264, we upheld the district court's decision to permit the plaintiffs' breach of fiduciary duty claim to proceed where the evidence established "that the [defendant] company actively misinformed its employees by affirmatively representing to them that their medical benefits were guaranteed once they retired, when in fact the company knew this was not true and that employees were making important retirement decisions relying upon this information . . . ." Id. at 1266-67.[0]

---

[0]        In In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 57 F.3d 1255 (3d Cir. 1995), we also reaffirmed our

Contrary to the district court's ruling, we believe these principles may apply in the instant case, even if the Plans fall within the purview of 29 U.S.C. § 1104(c). By its terms, section 1104(c) relieves fiduciaries of liability for breaches of fiduciary duty which result from a participant's or a beneficiary's exercise of control; it does not define nor does it relieve fiduciaries of section 1104(a)'s duties in the first instance. Therefore, the question we face at this juncture is not whether section 1104(c), even assuming it applies, exempts Unisys from section 1104(a)'s disclosure duty; it is whether the duty as we have defined it extends to the circumstances presented in this case. Although our prior decisions concerned allegations of material misrepresentations relating to the terms of a plan or the benefits to which participants or beneficiaries were entitled, we hold that their underlying rationale applies with the same force here. We can discern no reason why our admonitions that "when a [fiduciary] speaks, it must speak truthfully[]", Fisher, 994 F.2d at 135, and when it communicates with plan participants and beneficiaries it must "convey complete and accurate information that [is] material to [their] circumstance[]", Bixler, 12 F.3d at 1302-03, should not apply to alleged material misrepresentations made by fiduciaries to participants regarding the risks attendant to a fund investment, where, as here, the participants were charged with directing the

conclusion in Bixler, 12 F.3d at 1298, that under section 1132(a)(3) of ERISA, equitable relief is available to an individual harmed by a breach of fiduciary duty. 57 F.3d at 1266-69. The issue of relief is not raised in this appeal.

investment of their contributions among the Plans' various funds and the benefits they were ultimately provided depended on the performance of their investment choices. We also hold that in this context, a misrepresentation is "material" if there was a substantial likelihood that it would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in the Fixed Income and/or Insurance Contract Funds. See Fisher, 994 F.2d at 135.

It is important to note what we have not decided. As the uncontroverted record reveals that Unisys elected and indeed intended to communicate with participants about the risks accompanying investments in the Fixed Income and Insurance Contract Funds and Executive Life's financial condition in 1990,[0] we have not determined whether Unisys had a duty under section 1104(a) to communicate anything at all to the Plans' participants about these matters in the first place. We also note that we do not view the plaintiffs as claiming, nor do we hold, that Unisys was obligated to give investment advice, to opine on Executive Life's financial condition or to predict Executive Life's eventual demise. See id. at 135 (citations omitted) ("[W]e

---

[0] Unisys does not dispute that it made disclosures to participants, and describes the information it disseminated as intended to disclose the "nature of the [Plan's Executive Life holdings] and the attendant risks" and the "developments surrounding Executive Life . . . ." (See Memorandum in Support of Defendants' Motion for Summary Judgment and to Strike Jury Demand, pp. 17, 24). As in the district court, on appeal Unisys discusses the adequacy of its disclosures only in terms of section 1104(c).

53

hasten to add that ERISA does not impose a `duty of clairvoyance' on fiduciaries.").

Turning our attention to the record, we find a number of triable issues. Clearly there is evidence of several communications made by Unisys to plan participants on an individual, group or systematic basis regarding the nature of and risks associated with investments in the Fixed Income and Insurance Contract Funds and Executive Life's downturn.[0] Whether the communications constituted misrepresentations and whether they were material under the principles we have articulated are questions of fact that are properly left for trial. Id. at 135. See Curcio, 33 F.3d at 236 (holding that misleading summary plan description coupled with misrepresentations in an audiotape and a pamphlet supported a claim for breach of fiduciary duty). At this point, we observe that what was stated, as well as what was left unstated, by Unisys in its communications to plan participants is relevant. In our view, while Unisys was not obligated to share with participants everything it knew about GICs and Executive Life, it was obligated to impart to participants material information of which it had knowledge that was sufficient to apprise the average plan participant of the risks associated with investing in the Fixed Income and Insurance

---

[0]     For the first time on appeal Unisys asserts that the plaintiffs "have submitted no cognizable proof of detrimental reliance." Because Unisys did not proffer this issue in the district court, we decline to address it. See Selected Risks Ins. Co. v. Bruno, 718 F.2d 67, 69 (3d Cir. 1983) (federal appellate court generally does not consider issues not raised in the district court).

54

Contract Funds in view of the purchases of the Executive Life GICs and the financial condition Executive Life presented in 1990. Moreover, in this regard, we do not, as Unisys urges, distinguish between "public" and "non-public" information nor do we limit Unisys' duty to disclose to the latter. We do not see any reason under the circumstances for doing so, and at any rate, Unisys included public data, (credit ratings, for example), in its communications to plan participants.

Accordingly, we conclude that the plaintiffs raise genuine issues of material facts on their section 1104(a) failure to disclose claim.

IV.

Lastly, we address Unisys' assertion that section 1104(c) of the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 et seq. (1985 & Supp. 1995), applies in this case.

Generally speaking, ERISA holds fiduciaries who commit breaches of duty liable for resulting losses. 29 U.S.C. §1109.[0]

---

[0] Section 1109 of the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 et seq. (1985 & Supp. 1995), states in pertinent part:

**§ 1109. Liability for breach of fiduciary duty**

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach. . . .

Under section 1104(c) of the Act, however, a fiduciary is not liable for any loss or breach which results from a participant's exercise of control over the assets in his or her individual account.  Moreover, a participant who exercises such control is not deemed a fiduciary.  Section 1104(c) states:

> **§ 1104.  Fiduciary Breaches**
> **(c) Control over assets by participant or beneficiary**
>
> In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary[0])--

---

29 U.S.C. § 1109(a).

[0] Recognizing that "there may be difficulties in determining whether the participant in fact exercises control over his account[,]" Congress directed that "whether participants and beneficiaries exercise independent control is to be determined pursuant to regulations prescribed by the Secretary of Labor." H.R. Conf. Rep. No. 1280, 93d Cong., 2nd Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 5038, 5086.

The Secretary of Labor issued a final regulation for 29 U.S.C. §1104(c) in October, 1992.  29 C.F.R. § 2550.404c-1.  The regulation sets forth in considerable detail the "kinds of plans that are 'ERISA section [1104(c)] plans,' the circumstances in which a participant or beneficiary is considered to have exercised independent control over the assets in his account as contemplated by section [1104(c)], and the consequences of a participant's or beneficiary's exercise of control."  Id. §2550.404c-1(a).

Briefly, under the regulation, a plan must inform participants or beneficiaries that the plan is intended to constitute a plan described in section 1104(c) of ERISA and Title 29 of the Code of Federal Regulations and that "the fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participant or beneficiary."  Id. § 2550.404c-1(b)(2)(1)(i).  The plan must also allow participants the opportunity to choose from a broad range of investment

56

(1) such participant or
beneficiary shall not be deemed to
be a fiduciary by reason of such
exercise, and

(2) no person who is
otherwise a fiduciary shall be
liable under this part for any
loss, or by reason of any breach,
which results from such
participant's or beneficiary's
exercise of control.

29 U.S.C. § 1104(c) (footnote added).

Finding that the Plans gave the plaintiffs the
authority to determine into which Funds their respective
contributions were directed and that Unisys advised them of the
"non-guaranteed" nature of the investments in the Fixed Income
and Insurance Contract Funds, the district court held that the
plaintiffs had "control" over their assets under section 1104(c)
and that, therefore, Unisys was freed from section 1104(a)'s
disclosure duties.  Because the court concluded that Unisys was
entitled to summary judgment on the plaintiffs' breach of
fiduciary duty claims, it did not reach Unisys' assertion that

---

alternatives, give investment instruction with appropriate
frequency, diversify investments, and obtain sufficient
information to make informed investment decisions.  Id.
§2250.404c-1(a)-(c).

Generally, the regulation "is effective with respect to
transactions occurring on or after the first day of the second
plan year beginning on or after October 13, 1992."  Id.
§2250.404c-1(g)(1).  Transactions occurring before this date are
governed by section 1104(c) of the Act without regard to the
regulation.  Id. § 2250.404c-1(g)(3).

As the regulation was not in effect when the
transactions at issue occurred, it does not apply or guide our
analysis in this case.

57

section 1104(c) applies to relieve it of liability for the plaintiffs' alleged losses.  We have already determined that the court erred in granting summary judgment to Unisys on the plaintiffs' breach of fiduciary duty claims and in using section 1104(c) to excuse Unisys from the duty to inform that ERISA imposes upon fiduciaries.  We must now determine whether the district court's decision to grant Unisys summary judgment should nonetheless be affirmed because Unisys urges that section 1104(c) provides it with a complete defense to the plaintiffs' claims.

Our task in interpreting section 1104(c) and applying it here is, of course, to effectuate Congress' intent.  Negonsott v. Samuels, ___U.S.___, 113 S. Ct. 1119, 1122-23 (1993).  As with any inquiry of statutory construction, we start with the text of the statute, Pension Benefit Guar. Corp. v. White Consolidated Indus., Inc., 998 F. 2d 1192, 1198 (3d Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 687 (1994); "where [Congress'] will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive."  Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570 (1982).  If the statutory language is unclear, we then look to the Act's legislative history.  Blum v. Stenson, 465 U.S. 886, 896 (1984).

It is Unisys' position that even if it failed to satisfy ERISA's duties of prudence and diversification in the first instance by purchasing the Executive Life GICs for the Plans, the losses allegedly sustained in this case resulted from the "control" each plaintiff as a plan participant exercised -- the decision to invest in Executive Life by making an informed

58

choice to contribute to and maintain assets in the Fixed Income and Insurance Contract Funds. The plaintiffs' control, according to Unisys, emanated from two sources: the information Unisys distributed to plan participants regarding the personal responsibility they assumed for investment decisions, the nature of investments in the Fixed Income and Insurance Contract Funds in general and the Funds' holdings in Executive Life in particular,[0] as well as the Plans' contribution and transfer terms, which allowed each participant the freedom to allocate his or her assets among the various investment funds as he or she saw fit.

Given Unisys' position, the first question we must answer regarding section 1104(c) is whether the statute allows a fiduciary, who is shown to have committed a breach of duty in making an investment decision, to argue that despite the breach, it may not be held liable because the alleged loss resulted from a participant's exercise of control. In light of section 1104(c)'s plain language, we believe that it does. There is

---

[0] The information which Unisys contends is a source of the plaintiffs' control includes representations that the plaintiffs allege were materially misleading in violation of section 1104(a)'s fiduciary duty to disclose. Obviously, given the role these representations play in Unisys' section 1104(c) defense, Unisys cannot claim that section 1104(c) would relieve it from liability in the event that the representations are found to constitute breaches of ERISA's disclosure duties. It is also obvious that in the event these representations are found to have materially misled the plaintiffs, Unisys' theory of control under section 1104(c) would fail. Indeed, the parties do not dispute that accurate and complete information regarding the investments Unisys made for Fixed Income and Insurance Contract Funds is essential to the section 1104(c) control Unisys contends the plaintiffs exercised in this case.

nothing in section 1104(c) which suggests that a breach on the part of a fiduciary bars it from asserting section 1104(c)'s application.  On the contrary, the statute's unqualified instruction that a fiduciary is excused from liability for "any loss" which "results from [a] participant's or [a] beneficiary's exercise of control"[0] clearly indicates that a fiduciary may call upon section 1104(c)'s protection where a causal nexus between a participant's or a beneficiary's exercise of control and the claimed loss is demonstrated.  This requisite causal connection is, in our view, established with proof that a participant's or a beneficiary's control was a cause-in-fact, as well as a substantial contributing factor in bringing about the loss incurred.  See Willett v. Blue Cross and Blue Shield of Alabama, 953 F.2d 1335, 1343 (11th Cir. 1992) ("Section [1109] of ERISA establishes that an action exists to recover losses that `resulted' from the breach of fiduciary duty; thus the statute does require that the breach of the fiduciary duty be the proximate cause of the losses claimed . . . ."); Brandt v. Grounds, 687 F.2d 895, 898 (7th Cir. 1982) (Under 29 U.S.C. §1109, where "a fiduciary . . . who . . . breaches . . . shall be personally liable to make good . . . any losses resulting from each such breach", a causal connection is required between the breach of the fiduciary duty and the losses alleged.).

---

[0]    In this regard, section 1104(c) operates in alternative circumstances, excusing a fiduciary from liability for "any loss" or "by reason of any breach" which "results from [a] participant's or [a] beneficiary's exercise of control."  29 U.S.C. § 1104(c).

Section 1104(c)'s text, however, neither defines nor clarifies its central element -- the "control" a pension plan may permit a participant or a beneficiary to exercise. 29 U.S.C. §1104(c). Accordingly, we look to ERISA's legislative history for assistance. From a House Conference Report, we learn that section 1104(c) established a "special rule" for plans which allow a participant or a beneficiary "independent control" over individual account assets:

> *Certain individual account plans*. [A] special rule is provided for individual account plans where the participant is permitted to, and in fact does, exercise independent control over the assets in his individual account. In this case, the individual is not to be regarded as a fiduciary and other persons who are fiduciaries with respect to the plan are not to be liable for any loss that results from the exercise and control by the participant or beneficiary.

H.R. Conf. Rep. No. 1280, reprinted in 1974 U.S. Code Cong. & Admin. News at 5085-86.

From that same Report, we further learn that Congress conceptualized control in terms of authority on the part of a participant or a beneficiary to issue investment instructions to a fiduciary:

> Therefore, if the participant instructs the plan trustee to invest the full balance of his account in, e.g., a single stock, the trustee is not be liable for any loss because of a failure to diversify or because the investment does not meet the prudent man standards. However, the investment must not contradict the terms of the plan, and if the plan on its face prohibits such investments,

61

> the trustee could not follow the instructions
> and avoid liability.

Id. at 5086.

Finally, the Report tells us that a section 1104(c) plan must offer a "broad range of investments". Id.[0] Before we turn to section 1104(c)'s application to the evidence in this case, we have several observations to make. First, our analysis of the statute and Congress' statements of legislative intent lead us to believe that while all plans which qualify under section 1104(c) have certain elements in common, each section 1104(c) plan is unique, depending on the control a plan permits participants and beneficiaries to exercise by way of the investment instructions they may give. Second, because section 1104(c) speaks in terms of a plan which permits control to a participant or a beneficiary, a participant's or a beneficiary's

---

[0] In accordance with Congress' direction that we consult the common law of trusts for additional insight into ERISA's provisions, we note that a trustee may under certain circumstances be discharged from liability for losses that arise out of a particular transaction which represents a breach of trust. According to sections 216, 217 and 218 of the Restatement (Second) of Trusts respectively, where a beneficiary consents to, subsequently affirms or releases a trustee's breach of trust, he cannot thereafter hold the trustee liable for losses, unless at the time of consent, affirmance or release, the beneficiary was incompetent, not informed by the trustee of his rights and the material facts, subjected to the trustee's improper influence or made party by an interested trustee to an unfair or unreasonable bargain. Restatement (Second) of Trusts, §§ 216, 217, 218 (1959). In addition, under section 219 of the Restatement, a beneficiary may be barred from holding a trustee liable for losses by laches. Id. § 219.

We have not found, however, a common law trust principle that is analogous to the scheme that Congress established in 29 U.S.C. § 1104(c) as we understand it.

control under section 1104(c) stems from a plan's specific provisions, not from elements which lie outside the plan's structure and which may arguably amount to control in connection with a single transaction. Finally, section 1104(c) is akin to an exemption from or a defense to ERISA's general rule, relieving fiduciaries in the appropriate circumstances of the liability to which they would otherwise be exposed under 29 U.S.C. § 1109. Accordingly, a fiduciary which seeks section 1104(c)'s protection bears the burden of showing its application. See Lowen v. Tower Asset Management, Inc., 829 F. 2d 1209, 1215 (2d Cir. 1987) (holding that the defendant is in the best position to prove and should bear the burden of establishing its entitlement to an exemption under 29 U.S.C. §1108 from 29 U.S.C. §1106(b), ERISA's prohibited transactions provision); Donovan v. Cunningham, 716 F. 2d 1455, 1467-68 (5th Cir. 1983), cert. denied, 467 U.S. 1251 (1984) (ESOP fiduciaries charged with violations of section 1104(a)'s duty of prudence bear the burden of proving the "statutory defense" of adequate consideration under 29 U.S.C. §1108(e)).

Having carefully reviewed the record with this background in mind, we conclude that Unisys is not entitled to summary judgment on its section 1104(c) defense. The record is inadequately developed as to critical facts and demonstrates the existence of disputed material facts as to whether the Plans fall within the statute's coverage.

Starting with Congress' mandate that a section 1104(c) plan provide "a broad range of investments", we look to see

63

whether the uncontroverted evidence Unisys submitted establishes that the Plans gave participants a wide array of investments with materially different risk and return characteristics. Given Unisys' theory of control, we also look to see whether the evidence establishes that a participant could remove his or her assets from, in this instance, the Fixed Income or Insurance Contract Funds and place them in a comparable investment vehicle. In our view, if the Plans did not offer an acceptable alternative to GIC investments, a participant did not have the freedom and, in turn, the control to decide how his or her assets were ultimately invested. In this regard, we find the evidence lacking. The record includes documents which give a general description of the six funds the Plans offered; it does not, however, include evidence sufficient to measure the breadth of actual plan investments or assess all of the investment alternatives available to participants.

As stated, Unisys' contention that the plaintiffs were permitted control under section 1104(c) and indeed exercised it is premised, in part, on the information Unisys allegedly disseminated to participants regarding "his or her investment options[,] [his or her] obligation to manage his or her own investments[,] the risks associated with th[e] election to invest in GICs[,] and developments surrounding Executive Life. . . ." (See Defendants' Memorandum of Law in Support of their Motion for Summary Judgment and to Strike Jury Demand, pp.15-17). We agree that information, both general and relating specifically to Executive Life, is an essential element of Unisys' section

64

1104(c) theory that the plaintiffs themselves ultimately controlled whether their respective assets were invested in Executive Life GICs, even though Unisys chose the investment in the first place. For Unisys to prevail under section 1104(c), however, it must establish that the Plans provided information sufficient for the average participant to understand and assess: the control the Plans permitted a participant to exercise and the financial consequences he or she assumed by exercising that control; the rights that ERISA provided to participants and the obligations that the Act imposed upon fiduciaries; the Plans' terms and operating procedures; the alternative funds the Plans offered; the investments in which assets in each fund were placed; the financial condition and performance of the investments; and developments which materially affected the financial status of the investments.

Based on our careful review of the record, we find that Unisys has not satisfied its burden on summary judgment to show that this necessary information was provided to the Plans' participants. Significantly, the written documents which establish and maintain the Plans are conspicuously missing from the record. Thus, we cannot determine what information the Plans made available to participants as a matter of course. If Unisys' dissemination of the information it relies upon to assert section 1104(c)'s application in this case was not performed pursuant to a plan term but was merely situational, an isolated response to a crisis in one investment, then the control that Unisys contends the plaintiffs had was not permitted by the Plans as section

65

1104(c) requires and the statute's relief would be unavailable. As for the disclosures that Unisys included in the record, whether they communicated to the average participant the information we have decided is critical to Unisys' section 1104(c) defense are questions of fact properly left to the factfinder to decide at trial.

Moving to the second component of Unisys' position regarding the plaintiffs' control -- the Plans' contribution and transfer terms -- we agree with Unisys that the evidence is uncontroverted that for all intents and purposes, a participant's ability to make initial contributions to the Plans' various investment funds was unfettered. The transfer restrictions that the Plans imposed upon participants, however, are problematic. The record reveals that the Plans restricted transfers which involved all of the GIC Funds and the Short-Term Investment Fund in order to obtain higher interest rates from GIC issuers.[0] While we have no quarrel with the reason for the transfer restrictions or with the notion that the frequency with which a participant issues investment instructions may be restricted without necessarily eliminating the control that section 1104(c) contemplates, we believe that a reasonable factfinder could conclude that the duration and pervasiveness of the restrictions imposed upon participants by the Plans so significantly limited

---

[0]     Charles Service, a member of Unisys Corporation's Capital Management Trust Investment Department explained:  "These restrictions allow the insurance companies to forecast their cash flows with greater certainty, thereby reducing their risk.  With their risk reduced, the insurance companies which bid for our GICs can offer significantly higher yields."

their ability to decide in which Funds their respective assets were allocated, that the restrictions are antithetical to the concept of "independent control" that Congress enacted in section 1104(c). Moreover, assuming that control existed at the Plans' inception, the factfinder could conclude that when Unisys agreed on October 17, 1990, to give Executive Life the right under certain circumstances "to not honor employee requests for withdrawal" in exchange for Executive Life's consent to a reduction in the waiting period for asset transfers between "non-competing" funds and the GIC Funds, control within the meaning of section 1104(c) was no longer available to the participants under the Plans from that point forward.

Thus, we conclude that Unisys is not entitled to summary judgment on its section 1104(c) defense to the plaintiffs' breach of fiduciary duty claims.

Finally, we observe that in the event the plaintiffs prove that Unisys breached section 1104(a)'s duty of prudence and/or duty of diversification and Unisys proves that section 1104(c) applies as a defense, the losses for which Unisys would not be liable are those which, as to each plaintiff, occurred after he or she, free under the Plans' transfer terms to place the assets in any of the Plans' investment vehicles, exercised control by making the informed decision to contribute to and/or maintain assets in the Fixed Income Fund or the Insurance Contract Fund.

V.

67

For the foregoing reasons, we will vacate the district court's order of January 25, 1995 granting summary judgment to the defendants on Count I of the second amended consolidated class action complaint and remand for further proceedings on the plaintiffs' breach of fiduciary claims under section 1104(a) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. (1985 & Supp. 1995).